IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |
|---|---|
| BANEY CORPORATION, <br> Plaintiff, | * <br> * <br> * <br> * <br> * |
| v. | *    Civil Action No. 10-cv-00683-AW <br> * |
| AGILYSYS NV, LCC, d/b/a AGILYSYS <br> MD, INC. <br> Defendant. | * <br> * <br> * <br> * |

*****************************************************************************

**Memorandum Opinion**

Four motions are currently pending before the Court: (1) Defendant's motion to dismiss,

Doc. Nos. 17, 29,[1] (2) Plaintiff's motion to strike an exhibit attached to Defendant's reply brief

or, in the alternative, to file a surreply, Doc. No. 35, (3) Defendant's motion for a preliminary

injunction, Doc. No. 37, and (4) Defendant's motion for limited, expedited discovery, Doc. No.

38. The Court has reviewed the motion papers submitted by the Parties and finds that no hearing

is necessary. *See* D. MD. LOC. R. 105(6) (2010). For the reasons that follow, the Court will grant

in part and deny in part Defendant's motion to dismiss; grant Plaintiff's motion to file a surreply,

but deny Plaintiff's motion to strike; deny Defendant's motion for a preliminary injunction; and

deny Defendant's motion for limited expedited discovery.

I.       **FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are drawn from the Amended Complaint unless otherwise noted.

Plaintiff Baney Corporation ("Baney") owns and operates hotels at 17 different locations. In

---

[1] The first motion to dismiss pertains to the original complaint, *see* Doc. No. 17, and therefore it is now moot in light
of the Amended Complaint, *see* Doc. No. 24. Accordingly, it will be denied, and the Court's analysis will focus on
the motion to dismiss the Amended Complaint. *See* Doc. No. 29.

2005, Defendant Agilysys NV, LLC ("Agilysys"), through its corporate predecessor, offered to provide Baney with a computerized property-management system capable of servicing a multi-property client. At that time, Agilysys told Baney that "the software is looking great" and that it is "easy to use" and "PERFECT for a multi-property environment." Am. Compl. ¶ 8.

On or about September 20, 2006, Baney contracted with Agilysys to license the V1Net Property Management System ("V1Net System") at two of Baney's 17 hotel locations. *See* Doc. No. 29, Ex. A ("Contract 1"). On February 9, 2007, Baney signed a second contract that extended the V1Net System to all of Baney's other hotel locations. *See* Doc. No. 29, Ex. B ("Contract 2").

Plaintiff alleges that the V1Net System never functioned properly. "The various documented errors and problems experienced by Baney included, but were not limited to, critical glitches in accounts receivable, reservations, and other areas that were not handled in a timely manner, slow speed of the system impairing customer service, and security issues and breaches among multi-property access." *Id.* ¶ 15. Plaintiff argues that the version of the V1Net System installed at its hotel locations was actually a "beta test version" of the program, not a finished product, and that Agilysys concealed this fact from Baney. *Id.* ¶ 23.

Although Agilysys promised to "do everything we can to fix the bugs and improve the speed of the V1Net System," *id.* ¶ 16, Plaintiff claims that Agilysys never undertook serious efforts to repair the program. Indeed, Plaintiff contends that Agilysys "failed to act with diligence and in good faith and instead made the determination that the V1Net Property Management System would not continue to be one of its marketable products, and thus it was relegated to a low priority." *Id.* ¶ 17. Nonetheless, Plaintiff continues to use the V1Net System,

because it is still in the process of converting to a new property-management system. *See* Doc. No. 33-1 at 2 (affidavit of Kim Baney, vice president of Baney Corporation).

Plaintiff filed the original Complaint in this action on March 19, 2010, seeking recovery in contract and tort. *See* Doc. No. 1. Defendant moved to dismiss under Rules 12(b)(6) and 12(d) of the Federal Rules of Civil Procedure. *See* Doc. No. 17. Plaintiff subsequently amended the Complaint, *see* Doc. No. 24, and Defendant renewed its motion to dismiss, *see* Doc. No. 29. After the briefing was completed on the renewed motion to dismiss, Plaintiff moved to strike (or to file a surreply in response to) one of the exhibits attached to Defendant's reply brief. *See* Doc. No. 35. Defendant filed a motion for a preliminary injunction to prevent Baney from continuing to use the V1Net System until the outcome of this litigation, *see* Doc. No. 37, and another motion seeking early discovery on matters relating to the requested preliminary injunction, *see* Doc. No. 38.

## II.    ANALYSIS

The Court will address each of the four pending motions, beginning with Defendant's motion to dismiss.

### A. *Defendant's Motion to Dismiss the Amended Complaint*

Defendant's motion to dismiss challenges all claims in the Amended Complaint. *See* Doc. No. 29. The nine counts of the Amended Complaint can be sorted into two categories. The first set of counts seeks recovery on the basis of contract. *See* Count I (requesting declaratory judgment on several issues of contract interpretation); Counts II-III (alleging breach of Contracts

I and II); Count VI (seeking rescission of the contracts); Counts VII-VIII (alleging breach of implied warranties of merchantability and fitness for particular purpose); Count IX (alleging breach of express warranty). The claims in the other counts sound in tort. *See* Counts IV-V (alleging fraud and negligent misrepresentation).

1. Standard of Review

a. Motion to Dismiss

The purpose of a motion to dismiss under Rule 12(b)(6) is "to test the sufficiency of [the] complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, the complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2).

In its determination, the Court must "accept the well-pleaded allegations of the complaint as true," *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and "must construe factual allegations in the light most favorable to the plaintiff," *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court should not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), "legal conclusion[s] couched as . . . factual allegation[s]," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

b. Motion for Summary Judgment

When a motion to dismiss relies upon facts that are not included in or attached to the complaint, the Court must ordinarily convert it into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). Defendant indicated that the Court should treat its motion as a motion for summary judgment whenever it relies on the terms of the contracts, because the contracts were not attached to the Complaint. *See* Doc. No. 29-4 at 12. Plaintiff has not disputed this method for analyzing Defendant's motion, so the Court will follow the suggested course.

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). However, when a motion for summary judgment is filed prior to the completion of discovery (as is the case here), the nonmoving party's obligation is qualified by

Rule 56(f), which "allows a summary judgment motion to be denied . . . if the nonmoving party has not had an opportunity to make full discovery." *Celotex*, 477 U.S. at 326.

2.   Contract Claims: Counts I-III & VI-IX

a.   General Principles

Maryland law governs interpretation of the contracts at issue in this case. *See* Contract 1, § 3(5); Contract 2, § 3(5). The Uniform Computer Information Transactions Act ("UCITA") has been enacted by the Maryland legislature, *see* MD. CODE. ANN., COM. L. § 22-101, *et seq.* ("MUCITA"), and both contracts are covered by its terms, *see id.* § 22-103(a) ("This title applies to computer information transactions."). Maryland follows the objective theory of contract interpretation, which means that the Court must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985).

Although substantive questions of contract interpretation are governed by Maryland law, federal law defines the "allocation of functions between judge and jury" and the propriety of summary judgment. *Archer Daniels Midland Co. v. Brunswick Cnty., N.C.*, 129 Fed. Appx. 16, 23 (4th Cir. Mar. 15, 2005). "The general rule is that the interpretation of a writing, such as a contract, is a matter of law for the court." *Cunningham & Co., Inc. v. Consolidated Realty Mgmt., Inc.*, 803 F.2d 840, 842 (5th Cir.1986). However, once the Court has discerned the meaning of disputed contractual provisions, it is ordinarily for the jury to decide whether there has been a breach of the contract. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962).

b. Warranties not Referenced in the Written Contracts: Counts VII-IX

Both of the contracts contain several warranty disclaimer provisions, which indicate that Defendant's only warranties are those expressly mentioned in the text of the agreement. *See, e.g.*, Contract 1 § 1(10); Contract 2 § 1(10). The contracts expressly state that there are no implied warranties of merchantability or fitness for a particular purpose. *See* Contract 1 § 3(10); Contract 2 § 3(10).

In order to overcome these restrictive disclaimers, Plaintiff contends that Contract 2 never became an enforceable contract. According to Plaintiff, in lieu of the unenforceable written agreement, the Parties formed a contract through performance. Because the terms of the resulting contract are not defined in writing, the Court should imply the default rules provided by contract law, including the implied warranties of merchantability and fitness for a particular purpose. *See* Counts VII-VIII. Furthermore, by subverting the written agreement and its provisions limiting warranties to those expressly contained in the written agreement, Plaintiff argues that the Court can deem the Defendant's subsequent promises to repair and improve the V1Net System to be express warranties and valid modifications to the contract. *See* Count IX.

The basis for Plaintiff's conclusion that Contract 2 is not enforceable is that it was never signed by the Defendant.[2] The text of the agreement specifically indicates that it is "subject to written approval and acceptance at V1's office . . . by a duly authorized officer." Contract 2 § 3(9). Plaintiff claims that it never received a copy of Contract 2 signed by the Defendant prior to this litigation, *see* Doc. No. 33, Ex. A at 3 (affidavit of Kim Baney, vice president of Baney Corporation), and that discovery is necessary for Plaintiff to determine—through inspection of Defendant's corporate records, and possibly via deposition of Defendant's employees—whether

---

[2] Plaintiff does not dispute that Contract 1 was signed by both Parties and therefore is enforceable as written.

and when Contract 2 was signed by Defendant. Defendant has responded by producing a copy of Contract 2 signed by both Parties, *see* Doc. No. 29, Ex. B at 5, along with an affidavit by its senior corporate attorney, Scott Korpowski, stating that the version of Contract 2 attached to the motion to dismiss is a true and accurate copy of the original, *see* Doc. No. 29, Ex. C.

However, the Court does not need to decide whether Plaintiff has presented a genuine dispute of fact regarding the authenticity of Defendant's signature on Contract 2, because Counts VII-IX must be dismissed for an independent reason. Even granting Plaintiff's argument that the written version of Contract 2 is technically unenforceable, there are no facts from which a reasonable juror could imply the existence of a contract with terms different from the provisions of Contract 2. For the reasons stated below, the Court holds that, if a jury were to infer a contract on the basis of performance, any reasonable juror would have to conclude that the terms of the contract are those contained in Contract 2. Plaintiff is in the uncomfortable position of alleging breach of contract while simultaneously undercutting the only document that specifies the terms of the underlying contract.

Plaintiff relies on several decisions in which courts gave effect to contracts implied by performance instead of unsigned written contracts. For instance, in *Technographics, Incorporated v. Mercer Corporation*, 777 F. Supp. 1214 (M.D. Pa. 1991), the written agreement contained provisions similar to those of Contract 2: a disclaimer of implied warranties, a limitation on recovery of consequential damages, and a stipulation that the contract could only be modified by a signed, written instrument. The contract indicated that it would only become enforceable upon signature by both parties, and the defendant corporation failed to sign. Consequently, the court did not treat the written contract as an "offer," but rather as a "preliminary negotiation." *Id.* at 1216.

Subsequently, the plaintiff corporation submitted a purchase order with terms that differed from those of the written contract. The court therefore treated the purchase order as the real offer and, because the defendant accepted by performing in the manner requested in the purchase order, it became the real contract as well. *Id.*; *see also InfoComp, Inc. v. Electra Products, Inc.*, 109 F.3d 902, 906 (3d Cir. 1997) ("A contract has been formed between InfoComp and Electra in this case by reason of their performance. The terms of that contract, however, are governed by the provisions of the UCC as adopted in Pennsylvania, not the proposed written agreement that was never accepted by Electra.").

However, the case at bar is readily distinguishable. In *Technographics*, the record contained evidence that the parties did not intend for their performance to be governed by the terms of the written agreement initially proposed by the defendant corporation. The court emphasized that the purchase order subsequently submitted by the plaintiff contradicted some of the terms in the original writing. *Technographics*, 777 F. Supp. at 1216.

This case is different. Not only is there no evidence in the Parties' performance that they intended to depart from the terms of the written contract, but there is considerable evidence that they intended performance to be governed by that agreement. To begin with, it is undisputed that both Parties signed Contract 1 (thus making it a fully enforceable contract), and the terms of Contract 1 are virtually identical to those of Contract 2. In fact, Contract 2 is merely an expansion of the initial contract from two hotel locations to the remaining 15. All of the available evidence suggests that the Parties anticipated and intended that the same obligations would govern contractual performance at both sets of locations. Implying a contract different from Contract 2 would introduce an unnecessary and potentially intrusive discrepancy between the contracts governing each group of hotel locations.

Furthermore, it is undisputed that Plaintiff signed Contract 2. (The only dispute is whether Defendant signed.) At no time subsequent to signing Contract 2 (and prior to instituting this litigation) did Plaintiff express doubts about the validity of the agreement it signed or indicate that a different contractual arrangement applies to the hotel locations covered by Contract 2.

Finally, Contract 2 states that "[a]cceptance by Purchaser of any LICENSED PROGRAM from Agilysus shall be deemed *conclusive evidence of Purchaser's agreement that the license for such LICENSED PROGRAM is governed by this Agreement*." Contract 2 §3(5) (emphasis added). Plaintiff does not dispute that it accepted the installation of V1 technology at the hotel locations described in Contract 2. Plaintiff's acceptance is "conclusive evidence" that the contract thereby formed is governed by the terms of Contract 2. *Id.* For these reasons, no reasonable juror could imply, from performance, a contract with provisions different from those of Contract 2. Thus, the Court will give force to the warranty disclaimers in both contracts and dismiss Counts VII-IX, which allege express and implied warranties that are not mentioned in the written contracts.[3]

c. Express Warranties

The Parties also disagree about the nature of the warranties contained in the contracts. The paragraph entitled "Warranty" contains the controlling language, and the relevant portions of that paragraph are the following:

> V1 will install the LICENSED PROGRAM in a proper and workmanlike manner in accordance with generally accepted practices in the software industry. Each LICENSED

---

[3] For the same reason, the Court will dismiss the small portions of Counts II and III that rely on warranties that Defendant allegedly made via e-mail, after the signing of the contracts. *See* Am. Compl. ¶¶ 37, 44. However, the Court will not dismiss the remainder of Counts II and III, which rely on warranties contained in the contracts. *See* discussion *infra* § II(A)(2)(c).

PROGRAM, when delivered, will conform to V1's current published program specifications; however, Purchaser acknowledges that LICENSED PROGRAMS are of such complexity that they may have inherent defects and agrees that as V1's sole liability and as Purchaser's sole remedy V1 will provide programming services to correct documented program errors which V1's diagnosis indicates are caused by a defect in an unaltered version of the delivered LICENSED PROGRAM. . . . V1 does not guarantee the results of any such services or represent or warrant that any or all errors will be corrected.

Contract 1 § 2(7); *see also* Contract 2 § 2(7).

Defendant contends that the only warranties are that "V1 will install the [program] in a proper and workmanlike manner" and that the programs, "when delivered, will conform to V1's current published program specifications." Plaintiff argues that, in addition to these warranties, the language immediately following "published program specifications" also constitutes a warranty: "however, Purchaser acknowledges that [the programs] are of such complexity that they may have inherent defects and agrees that as V1's sole liability and as Purchaser's sole remedy *V1 will provide programming services to correct documented program errors*." *Id.* (emphasis added).

Defendant's position is that this language does not provide a distinct warranty, but instead specifies the remedy for a breach of the warranty that the program "will conform to V1's current published program specifications." Defendant emphasizes that the contract cannot plausibly be interpreted as creating a warranty that all program errors will be corrected, because the warranty paragraph specifically states that "V1 does not guarantee the results of any such services or represent or warrant that any or all errors will be corrected." Plaintiff argues in reply that this language directly contradicts the Defendant's express warranty to "correct documented program errors," and therefore that it is void, *see* MUCITA § 22-406(a) (stating that a "disclaimer or modification [of an express warranty] is inoperative" if it cannot reasonably be reconciled with the express warranty).

11

First of all, the Court agrees with Plaintiff that the contracts create a warranty on the part of V1 to "correct documented program errors." Defendant defines warranties as "statement[s] or representation[s] made by the seller of goods . . . having reference to the character, quality, kind, variety, or title of the goods." *Herndon v. S. Pest Control Co.*, 307 F.2d 753, 755 (4th Cir. 1962) (citation omitted). However, Defendant overlooks the newer statutory definition of warranty contained in the MUCITA, which includes not only "affirmation[s] of fact," but also "promise[s] made by the licensor to its licensee . . . which relates to the [software] and becomes part of the basis of the bargain." MUCITA § 22-402(a)(1). The obligation to correct documented program errors is a "promise" by the Defendant relating to the software. Thus, it is a warranty under the MUCITA.

However, the warranty is more limited in scope than Plaintiff suggests. Read in context, it is clear that Defendant does not guarantee that the repair services will always be successful. Instead, the obligation to repair is qualified by the disclaimer that "V1 does not guarantee . . . that any or all errors will be corrected." For the reasons that follow, the Court finds that this qualification is consistent with the warranty, and therefore it will be upheld.

Plaintiff contends that this language directly contradicts the warranty, and therefore that it is void under MUCITA section 22-406(a). However, invalidating contractual language is a last-resort remedy under section 22-406(a): "Words or conduct relevant to the creation of an express warranty and words or conduct tending to disclaim or modify an express warranty must be construed wherever reasonable as consistent with each other." *See also Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1033 (Md. 1993) ("It is a recognized rule of construction that a contract must be construed in its entirety and, if reasonably possible, effect must be given

to each clause or phrase so that a court does not cast out or disregard a meaningful part of the writing.").

The Court finds that there is a reasonable way to reconcile the warranty and the disclaimer. The warranty is best interpreted as a promise by V1 to provide services that represent a good-faith effort to correct documented program errors. This reading has several advantages. First, it gives effect to all of the contractual language. Plaintiff's interpretation of the warranty would obligate the Defendant to successfully fix all program errors, which directly contradicts the disclaimer. Conversely, Defendant's interpretation renders the warranty meaningless. Although Defendant never expressly says so, its position appears to be that if it provides any services at all to repair documented program errors, then its warranty obligation is satisfied. The implication of this approach is that the warranty obligation could be discharged by halfhearted, token repair services; thus, Defendant's interpretation reduces the warranty to a mere triviality. The Court's approach, by contrast, would give force to the warranty by requiring the Defendant to make a good-faith effort to fix program errors. However, it would also acknowledge the disclaimer by defining the Defendant's obligation in relation to the required quantum of effort (*i.e.*, a good-faith effort), not a particular result.

Furthermore, the Court's construction harmonizes with other language in the contracts. For instance, the prefatory language at the beginning of Contract 1 envisions (even though it does not, by itself, expressly warrant) a cooperative and good-faith business relationship in which the Defendant "commit[s] to working with Baney Corporation as a partnership in technology for the development of the V1Net property management system," and represents that it will make Baney a "top priority." Contract 1 at 1. Even more telling is the very first sentence of Schedule G (attached to both contracts), which states that "[u]pon Purchaser's request [V1]

shall exercise its best efforts to promptly diagnose and correct defects in the performance of the V1-developed software." *Id.*, Schedule G at 13, ¶ 1; *see also* Contract 2, Schedule G at 17, ¶ 1.

Finally, the Court's interpretation resonates with the applicable legal framework. MUCITA section 114(b) states that "[e]very contract or duty within the scope of this title imposes an obligation of good faith in its performance or enforcement." The point here is not that section 114(b) creates a warranty of good faith independent of the warranties specifically listed in the contract. Rather, section 114(b) supplies a background principle of interpretation that guides the Court's construction of the warranties that are expressly included in the contract. It reveals the Maryland legislature's intention that all different kinds of contractual duties should be construed in light of the generally applicable duty of good faith.

### d. Breach of Warranty

Given that the contracts include a warranty to provide good-faith repair services to correct documented program errors, as described in the previous sub-section, the Amended Complaint alleges sufficient facts relating to breach of warranty to survive a motion to dismiss. Plaintiff claims, among other things, that Defendant "substantially failed to correct the documented program errors that were caused by defects in the program, failed to make its best efforts, and failed to act diligently or in good faith with regard to its obligation." Am. Compl. ¶ 34. The statement of facts in the Amended Complaint lays out the basis for these conclusions in more detail, documenting a history of defects and lack of diligence on the part of Defendant in attending to and repairing those defects.

The factual record regarding breach of contract is too sparse at this stage to resolve Defendant's motion for summary judgment. Unlike the issues of contract interpretation resolved

earlier in this opinion, the question of breach is factually intensive and may depend on documents and information in the hands of the Defendant. Thus, the Court will provide the Plaintiff an opportunity to seek discovery on Counts I-III and will deny the motion for summary judgment, without prejudice to Defendant's right to re-file its motion at the close of discovery.

      e.  Futility of Sole Remedy

Defendant's promise to "correct documented program errors" is not merely a warranty; it is also Defendant's "sole liability" and Plaintiff's "sole remedy." Contract 1 § 2(7); Contract 2 § 2(7). Under MUCITA section 22-803(a), parties are permitted to contractually define the remedies for breach of contract, even to the point of eliminating judicial remedies and creating an "exclusive, . . . sole remedy." However, "if performance of an exclusive or limited remedy causes the remedy to fail of its essential purpose, the aggrieved party may pursue other remedies under this title." *Id.* § 22-803(b). The official comments to the UCITA indicate that, for contracts in which the sole remedy involves a right of repair, "the agreed remedy contemplates a functioning product. Non-performance of the remedy leaves the licensee without what it bargained for under the contract, a functioning product." NAT'L CONF. OF COMM'RS ON UNIFORM STATE LAWS, UCITA § 803 Cmt. 5(a) (2001).

For the reasons laid out in the previous sub-section, it is premature for the Court to decide whether to grant summary judgment based on the sole-remedy provision. The Fourth Circuit has made clear that a repair remedy fails of its essential purpose when the seller "has refused to make repairs as he was required or where he cannot repair the product." *Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043, 1046 (4th Cir. 1989). Although *Riegel Power* concluded that the remedy before the court did not fail of its essential purpose, its reasoning process strongly suggests the

opposite outcome for this case (assuming that Plaintiff can prove to a jury that Defendant failed to make a good-faith effort to repair documented program errors). *Riegel Power* emphasized that "[t]he parties acted in good faith both in agreeing on the contract and in performance under the contract." The court approved of, but distinguished, a case in which the U.S. District Court for the Southern District of New York held that a sole remedy failed of its essential purpose because the seller had "'acted in bad faith'" and had "'been willfully dilatory in rendering repairs.'" *Id.* (quoting *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 453 (S.D.N.Y. 1976)).

Thus, given the nature of the warranty provisions at issue in this case, the sole-remedy analysis hinges on many of the same under-explored facts as the breach-of-warranty analysis. Plaintiff should be afforded the opportunity to seek discovery to determine whether the sole remedy has failed of its essential purpose.

f. Limitations on Recoverable Damages

The contracts also contain a number of provisions that restrict the type and amount of damages that can be recovered in the event of breach. They both specifically disclaim Defendant's liability for "lost profits" and for "special, indirect, or consequential damages." Contract 1 § 1(10); Contract 2 § 1(10). The contracts also specify that Defendant's liability "shall not exceed the charges paid by Purchaser . . . for the particular LICENSED PROGRAM involved." Contract 1 § 3(10); Contract 2 § 3(10). Defendant argues that these provisions are independent of the sole remedy and therefore are enforceable even if the sole remedy fails. Plaintiff argues that the failure of the sole remedy requires invalidation of the damage-limitation provisions as well.

The Court agrees with Plaintiff. Defendant relies on case law developed under the UCC to support a presumption that damage-limitation provisions are enforceable even when a sole remedy is invalid. *See, e.g.*, *Patapsco Designs, Inc. v. Dominion Wireless, Inc.*, 276 F. Supp. 2d 472, 476-77 (D. Md. 2003) ("[T]he provision excluding consequential damages survives even if another provision limiting the remedy in certain circumstances has failed of its essential purpose.").

The UCITA specifically reverses the UCC presumption, rendering this body of case law inapplicable. Under MUCITA section 22-803(c), the failure of an "exclusive . . . remedy makes a term disclaiming or limiting consequential or incidental damages unenforceable unless the agreement expressly makes the disclaimer or limitation independent of the agreed remedy." The comments to the rule clarify that the UCITA "rejects cases under Article 2 of the [UCC] which hold that the two types of terms are presumed independent. A consequential damage limit fails if performance of the limited remedy fails unless the agreement makes the consequential damages limit expressly independent of the other limited remedy." NAT'L CONF. OF COMM'RS ON UNIFORM STATE LAWS, UCITA § 803 Cmt. 5(b) (2001).

Although there is no case law interpreting section 803(c) of the UCITA, its application to the facts of this case is fairly straightforward. Defendant cannot identify any language in the contract that "expressly makes the disclaimer or limitation independent of the agreed remedy." MUCITA § 22-803(c). Defendant advances plausible, yet inconclusive, arguments for why the Court should imply the independence of the two provisions from the language and purposes of the contract. However, the UCITA does not authorize the Court to imply the independence of the provisions by reading between the lines of the contract: independence must be stated "expressly." *Id.*; *see also* BLACK'S LAW DICTIONARY 601 (7th ed. 1999) ("[E]xpress, *adj.* Clearly

17

and unmistakably communicated; *directly stated*." (emphasis added)). Because the provisions are mutually dependent, and because the Court has already held that summary judgment is premature as to the alleged failure of the sole remedy, the Court will likewise deny summary judgment as to the damage-limitation provisions of the contracts.

g. Rescission: Count VI

In addition to damages, Plaintiff seeks rescission of the contract. Rescission is a "purely equitable remedy" that aims to restore contracting parties to the position they were in prior to entering the contract. *Contract Materials Processing, Inc. v. KataLeuna GmbH Catalysts*, 303 F. Supp. 2d 612, 654 (D. Md. 2003). Rescission may be granted for a variety of reasons, only one of which Plaintiff invokes: material breach. *See, e.g.*, *Plitt v. McMillan*, 223 A.2d 772, 774 (Md. 1996) ("Where . . . there has been a material breach of a contract by one party, the other party has a right to rescind it."). However, even when a material breach has occurred, rescission is generally appropriate only when "the party exercising a right to rescind notif[ies] the other party and demonstrate[s] an unconditional willingness to return to the other party both the consideration that was given and any benefits received." *Cutler v. Sugarman Org., Ltd.*, 596 A.2d 105, 111 (Md. Ct. Spec. App. 1991).

The Defendant raises two objections to the remedy of rescission, neither of which the Court finds persuasive at this stage in the litigation. First, Defendant contends that the Amended Complaint does not allege notice of intent to rescind with sufficient specificity. Plaintiff does not mention the date or the circumstances under which it notified Defendant of its intent to rescind. However, the Amended Complaint does allege that "Baney notified Agilysys as soon as it determined that it would be necessary to completely replace the V1Net Property Management

System at all of its hotels, and that it would not treat the contract as a continuing obligation." Am. Compl. ¶ 62. This fact, which the Court must take as true in the procedural posture of a motion to dismiss, is adequate to support the conclusion that Plaintiff provided reasonably prompt notice to Defendant of its intention to rescind the contract.

Second, Defendant argues that Plaintiff is unwilling to destroy or return the software program, which is essential for restoring the Defendant to its pre-contract position. *See Cutler*, 596 A.2d at 111 ("Rescission requires at a minimum that the party exercising a right to rescind . . . demonstrate an unconditional willingness to return to the other party both the consideration that was given and any benefits received.").

Plaintiff concedes that it is not completely prepared to return or destroy the software yet. The Complaint alleges that Plaintiff "stands ready to return the [software] to Agilysys *as soon as is practicable*." Am. Compl. ¶ 64 (emphasis added). The first affidavit of Kim Baney, vice president of Baney Corporation, explains that Baney "will certainly be willing to return V1Net software to Agilysys, but cannot do so until it completes the conversion of all properties to new software." Doc. No. 33, Ex. A at 2. A second affidavit by Kim Baney describes the logistical challenge and extensive planning involved in converting a hotel chain from one type of property management software to another and explains the steps that Baney Corporation has taken to complete the conversion as expeditiously as possible. *See* Doc. No. 40, Ex. 1.

Plaintiff's inability to immediately return the software is an obstacle, but not a *per se* bar, to its right to seek the remedy of rescission. Although restoring the Parties to their pre-contractual positions is the ideal and goal of rescission, it is "not an absolute prerequisite." *Contract Materials*, 303 F. Supp. at 654. In situations where the facts suggest that it would be

most equitable to allow rescission despite the impossibility or undesirability of complete restoration, "the modern tendency is to allow the relief." *Funger v. Mayor & Council of Town of Somerset*, 223 A.2d 168, 173 (Md. 1966).

It is much too early in this litigation for the Court to balance the equities and determine whether Plaintiff is justified in delaying the return of Defendant's software. Discovery is indispensable because it will enable the Parties to create a factual record relating to the following issues: (1) whether Plaintiff has been prompt and diligent in its efforts to convert to a new software technology, (2) how Plaintiff's business would be affected if it were to accelerate its conversion (or even return the software prior to the finalization of a conversion), and (3) the extent to which Defendant has been prejudiced by the delay. Thus, the Court will deny Defendant's motion as to Count VI and permit Plaintiff to seek discovery relevant to its rescission claim.

3. Tort Claims: Counts IV & V

In Counts IV and V, Plaintiff alleges that Defendant is liable for fraud and negligent misrepresentation. Plaintiff's claims are based on two allegedly fraudulent or misleading events: (1) Defendant's representation that "the V1Net Property Management System was easy to use and perfect for a multi-property environment," and (2) Defendant's failure to disclose that the program "was a beta test version of the software, not yet fully tested and not ready for deployment in an operating multi-property environment." Am. Compl. ¶¶ 47-48. The Court agrees with Defendant that these allegations are insufficient as a matter of law to state a claim for intentional or negligent misrepresentation.

In order to recover damages for fraud, Plaintiff must prove the following: "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Nails v. S & R, Inc.*, 639 A.2d 660, 668 (Md. 1994).

Recovery under a negligent-misrepresentation theory requires proof of a similar set of elements: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence." *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 539 (Md. 1982).

Furthermore, Maryland law distinguishes between statements that relate to material facts—which may give rise to cognizable claims—and vague generalities, statements of opinion, or puffery—which are deemed non-cognizable. *See, e.g.*, *McGraw v. Loyola Ford, Inc.*, 723 A.2d 502, 512-13 (Md. Ct. Spec. App. 1999) (holding that statements that amount to "indefinite generality," "puffing" and "sales talk" cannot give rise to a fraud claim because such statements are "'offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer, and on which no reasonable [person] would rely'" (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 109 at 757 (5th ed. 1984))); *McAleer v. Horsey*, 35 Md. 439, 1872 WL 4422 at *7 (1872) ("[F]raud must be material

to the contract or transaction which is to be avoided, for if it relate to another matter or to this only in a trivial and unimportant way, it affords no ground for the action of the Court.").

This distinction is fatal to Plaintiff's misrepresentation claims. Defendant's statement that the program would be "easy to use and perfect for a multi-property environment," Am. Compl. ¶ 47, is too much like an opinion to constitute a misstatement of fact, and it is too vague to justify reliance. Maryland courts have frequently rejected fraud claims based on strikingly similar statements. For instance, in *Milkton v. French*, 150 A. 28 (Md. 1930), a vendor had represented to a potential home buyer that the building was "perfectly safe on the concrete, roof and everything else of the construction." *Id.* at 31. The plaintiff alleged that the home was defective, and therefore that the vendor's claim of perfection was fraudulent. The court held that the defendant was not liable for fraud, because the claim of perfect construction "was so extravagant in scope and measure and so indefinite and elusive in meaning that the statement would fall within the category of a puff instead of a representation." Given the vagueness of the vendor's claim, "the plaintiff, who was an architect of experience, could not have been misled or influenced." *Id.* at 31-32.

The same reasoning applies to the Defendant's alleged statement that the program would be "perfect" and "easy to use." Am. Compl. ¶ 47. The statement does not stake out a claim regarding any concrete facts about the program. Instead, the statement is mere puffery or sales talk, which cannot give rise to fraud liability. It is unthinkable that Plaintiff, a savvy corporate consumer of property-management software, relied on vague statements such as these (rather than the more specific promises laid out in the contract itself). Insofar as Plaintiff did rely on Defendant's indefinite assurances, Maryland law would find Plaintiff's reliance to be unreasonable.

Similarly, Plaintiff cannot make out a fraud claim based on the allegation that Defendant negligently or intentionally concealed the fact that the software was a "beta test version" rather than a complete product. Am. Compl. ¶ 48. Nowhere does Plaintiff identify the aspects of the program that are incomplete or articulate a legal basis for why Defendant was under a duty to disclose the allegedly deficient features of software. In any event, Contract 1 expressly states, in its introductory section, that the two parties will work together "for the development" of the software. Contract 1 at 1. Furthermore, the Warranty section of each contract acknowledges that the software is "of such complexity" that it "may have inherent defects"; to guard against this possibility, Defendant promised to make efforts to repair documented program errors. *See* Contract 1 § 2(7); Contract 2 § 2(7). Defendant plausibly contends that these statements constitute an acknowledgment that the program may need further improvement and modification after installation—the very thing that Plaintiff alleges to have been concealed. Thus, Plaintiff's fraud and negligent-misrepresentation claims will be dismissed.

In summary, Counts IV-V and VII-IX will be dismissed in their entirety. Counts I and VI survive in their present form. The sentence of Counts II and III that refers to warranties formed after the signing of the written contracts will be dismissed, *see* Am. Compl. ¶¶ 37, 44, but Counts II and III otherwise remain intact.

### B. *Motion to Strike or to File a Surreply*

Some background is essential in order to grasp the import of Plaintiff's motion to strike or to file a surreply. As was discussed in the previous section, Plaintiff's primary contract-based theory is that Defendant warranted not only that the program would initially conform to "published program specifications," but also that the Defendant would document and correct

program defects. Defendant's motion to dismiss contends that there is no warranty to correct program defects, only a warranty that the program, when installed, would conform to published specifications. In its opposition, Plaintiff vigorously contests Plaintiff's effort to limit the warranty, but also argues, in the alternative, that Defendant may also have breached its obligation to deliver a program that conforms to published specifications. Plaintiff emphasizes that Defendant never supplied it with any published specifications, and that discovery would be necessary to determine what the specifications are (and whether they have been breached). In its reply brief, Defendant attached as an exhibit a copy of an electronic document that forms part of the program's user interface, claiming that the document constitutes published specifications. *See* Doc. No. 34, Ex. D.

Plaintiff's motion asks the Court to strike the exhibit on the grounds that it should have been presented in the original motion, not the reply. In the alternative, Plaintiff requests an opportunity to file a surreply explaining why Defendant's new exhibit does not justify granting summary judgment. *See* Doc. No. 35. The Court finds that Defendant's new exhibit was a fair and reasonable response to an argument that Plaintiff first raised in its opposition brief: specifically, the argument that no published program specifications exist, and that Defendant breached its warranty obligation to install a program in conformity with published program specifications. Thus, striking the exhibit is uncalled for. However, Defendant concedes that Plaintiff should be given an opportunity to rebut Exhibit D. The Court agrees and grants the portion of Plaintiff's motion that requests leave to file the surreply attached to its motion.

### C.  Defendant's Motion for a Preliminary Injunction

Defendant moves for a preliminary injunction to prevent Plaintiff from using the V1Net System pending the outcome of this litigation. *See* Doc. No. 37. Defendant contends that Plaintiff's ongoing use of the software is illegal, because Plaintiff has ceased making the necessary license payments and Defendant has validly terminated the licenses.

The Court should issue a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure when a party establishes the following: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).

On the record currently before it, the Court holds that a preliminary injunction is inappropriate. First, the motion is premature. A preliminary injunction is not a permanent, standalone remedy, but a temporary measure that anticipates and safeguards the viability of a remedy sought in a complaint or a counterclaim. However, Defendant has not yet filed its counterclaim. Thus, the Court is left without a foundation for determining whether Defendant is "likely to succeed on the merits." *Id.* Based on Defendant's motion, the Court could attempt to guess at the likely contents of the counterclaim Defendant will eventually file, but the Court rejects this speculative approach and will instead wait until the record includes a concrete demand for relief.

Second, Defendant has failed to show how it would be seriously harmed by Plaintiff's ongoing use of the technology, much less why that harm outweighs the damage Plaintiff would suffer if it were forced to stop using the V1Net System before its full conversion to a new property-management system is complete. *See* discussion *supra* § II(A)(2)(f) (summarizing the affidavit testimony of Kim Baney indicating that the conversion process is complex and time-

consuming, and that a smooth transition to new software is essential to Plaintiff's business). Thus, Defendant's motion will be denied.

### D. *Defendant's Motion for Limited Discovery*

Defendant has also filed a motion seeking limited discovery relevant to its motion for a preliminary injunction. *See* Doc. No. 38. Because the Court has already opted to deny Defendant's motion for a preliminary injunction, and the Defendant has not provided any reason for expedited discovery other than its relevance to the issues raised in the preliminary-injunction motion, this motion will also be denied. In any event, the Court will be issuing a Scheduling Order along with this opinion, which means that discovery will soon be available to Defendant on any issue relevant to the Amended Complaint (and any counterclaim, if the Defendant opts to file one).

### III.    CONCLUSION

The Court will issue a separate order memorializing the decisions rendered in this opinion.

_____March 28, 2011_____         _____/s/_____
            Date                  Alexander Williams, Jr.
                        United States District Judge